**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN APPLIE IPHONE, CURRENTLY IN DEA CUSTODY IN BANGOR, MAINE | No. 1:24-mj-00138-JCN<br><br>FILED UNDER SEAL |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Nicholas Rich, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—one electronic device—which is described in Attachment A and currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the U.S. Drug Enforcement Administration ("DEA") and have been since February of 2008. I am presently assigned to the Bangor, Maine, office and have received extensive training pertaining to narcotic investigations and the investigation of various crimes which arise from drug trafficking activities. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c). As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. During my employment with DEA, I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, fentanyl, methamphetamine, diverted pharmaceuticals, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Sections

841 and 846. I have conducted or participated in, among other things, surveillance, the execution of search and arrest warrants, debriefings of informants and confidential sources, and reviews of recorded conversations relating to narcotics trafficking. I have authored drug-related search warrant requests and successfully executed such warrants resulting in the seizure of drugs and other contraband, including firearms. I have also assisted in the execution of numerous drug-related search and arrest warrants. I have received extensive training in the field of narcotics enforcement and investigations. I am very familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs, including the use of the internet, internet platforms, applications, and cellular telephones to facilitate those activities.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested warrant.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of federal law, to include 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846, and 21 U.S.C. § 843(b) (hereinafter "Target Crimes") have been committed by one or more persons. There is also probable cause to search the device described in Attachment A for evidence of these crimes, as described in Attachment B.

## ITEMS TO BE SEARCHED

5. I seek a warrant to search the item more fully described in Attachment A, hereinafter "the Device." The Device is a black Apple iPhone that is cracked and broken on one side, with an assigned Text Now phone number 207-816-9099. It was seized from Andrew Marin on April 21, 2024.

6. The applied-for warrant would authorize forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7. The DEA, together with partner agencies, has been investigating a subject known as "Leon Leon" and "Leon" for utilizing a particular Facebook Account (described for purposes of this affidavit as the "Leon Leon Account"), in the distribution of illegal controlled substances in the Bangor region. Specifically, the DEA has developed information that a Boston resident named Alexis De Leon, together with multiple associates, is using the Leon Leon Account and also cellular telephones to arrange for the distribution of drugs in eastern Maine. Leon and other individuals are making short trips from Boston to the Bangor region to distribute drugs and collect drug proceeds from Maine sub-distributors.

*Relevant Prior Authority and Background Facts*

8. On February 7, 2024, the DEA applied for and obtained a search warrant from this Court in 1:24-mj-34-JCN, which authorized the collection of prospective location information as to a T-Mobile cellular telephone assigned 917-963-3689 (the "3689 number"). That application and warrant are attached as Exhibit 1. The affidavit

in Exhibit 1 explains the background of this investigation and the identification of both the Leon Leon Account and the 3689 number. Exhibit 1 is expressly incorporated herein for purposes of probable cause. On March 7, 2024, the DEA applied for and obtained authority to extend the period of collection as to prospective location information as to the 3689 number. *See* Docket No. 1:24-mj-00070-JCN.

9. On April 11, 2024, the DEA applied for and obtained a search warrant from this Court in 1:24-mj-112-JCN, in order to obtain prospective location information from T-Mobile as to a cellular telephone assigned number (207) 735-9606 (the "9606" number) a believed replacement phone for the 3689 number. Among the facts submitted in support of that application were the following.

    a. Based on information received pursuant to prior authority, the DEA came to believe that Jane Doe 5 was a customer of Leon, due largely to a significant number of contacts between a phone associated with Jane Doe 5 and the 3689 number.[1] On March 29, 2024, I interviewed Jane Doe 5, who admitted to recently purchasing fentanyl from Leon and doing so via communications with the 3689 number. Jane Doe 5 showed communications on her phone which, based on my training and experience, were consistent with her arranging purchases of controlled substances with Leon at the 3689 number. Following this interview, Jane Doe 5 agreed to perform a controlled purchase

---

[1] Jane Doe 5 was already involved in an ongoing ATF investigation involving a January 2024 seizure of drugs and guns from her residence and a nearby camper. Jane Doe 5 had previously been interviewed by the ATF in regards to that investigation and did not at that time disclose any relationship to the Leon DTO. Jane Doe 5 has a significant criminal history, including prior felony convictions in Maine for drug trafficking, thefts, and burglary.

of controlled substances from Leon, at the direction of MDEA and DEA. On April 2, 2024, Jane Doe 5 communicated with Leon at the 3689 number and coordinated the purchase of approximately 30 grams of fentanyl in Bangor, Maine. Following those communications, Jane Doe 5 ultimately conducted a controlled purchase on April 2, 2024, of approximately 30 grams of suspected fentanyl from a vehicle believed to be operated by Dianet Soto Sanz and Leon's brother, Ramon De Leon.

b. Following the controlled purchase described above, surveillance was conducted on the vehicle operated by Soto Sanz as it continued to travel in Bangor. Agents observed Mandi Ford meet with Ramon De Leon and Soto Sanz in the back seat of Soto Sanz' vehicle. Ford was then observed leaving the residence in her own white Fiat sedan.[2] Agents then coordinated a traffic stop of the white Fiat, which was occupied by Mandy Ford and Stephen Libby. Agents joined Bangor Police Officers on this traffic stop and assisted in searching Ford's vehicle. Officer Cronk located and seized approximately 51.1 grams of suspected fentanyl in Libby's pocket. I provided Ford with her Miranda rights, as witnessed by MDEA Agent Dan Gastia, and asked Ford about the fentanyl. Ford identified a surveillance photo of Ramon De Leon and identified him as "Ramon", and admitted to meeting with Ramon and Soto Sanz prior to the traffic stop in order to obtain drugs. She also permitted

---

[2] On February 7, 2024, I had spoken with Mandi Ford while she was incarcerated at the Penobscot County Jail. At that time, in a Mirandized interview, Ford stated she and her boyfriend had been purchasing fentanyl from the Leon DTO.

5

agents to review messages on her phone with the 3689 number.

c. Jane Doe 5 had shown me a text message, sent from the 3689 number on approximately March 23, 2024, with the following message: "Greetings, I will change my number tomorrow for security and to take care of myself more I will send you a message with my name Leon tomorrow." In reviewing Mandi Ford's messages on the Device with the 3689 number, I noted that on approximately March 23, 2024, the 3689 number sent an identical message to Ford as it had sent to Jane Doe 5, regarding a plan to change the phone number. But the 3689 number had then remained active with Ford and Jane Doe 5 until April 2, 2024.

d. On April 5, 2024, Jane Doe 5 received a message from (207) 735-9606 (the 9606 number) as follows: "Brother, how are you? I'm Leon. This is my new number, brother. I put the Maine number. It's me, Alex." At the direction of agents, Jane Doe 5 messaged the 9606 number regarding an additional purchase of fentanyl. The 9606 number responded: "All right, let me know how for when if for Monday or so."

e. I subsequently confirmed with T-Mobile that the 9606 number is indeed a number with T-Mobile service. I also obtained limited toll records for the 9606 number. The information received from T-Mobile was consistent with the number having been activated recently and, in addition, showed the phone has already been in communication with multiple phone numbers believed to be used by Bangor region customers of the Leon DTO, further confirming the information received on Jane Doe 5's phone.

*Seizure of Device*[3]

10. On April 18, 2024, the 9606 number messaged Jane Doe 5 and, based on my training and experience and interpretation of the messages I reviewed, advised her that he would be in Maine to deliver fentanyl on April 21, 2024. At the direction of agents, Jane Doe 5 requested to purchase 30 grams of fentanyl for $600. On April 21, 2024, at approximately 7:40 a.m., information provided from T-Mobile showed the 9606 number moving from Dorchester, Massachusetts and towards Maine. Jane Doe 5 then conducted an audio and video recorded controlled purchase of suspected fentanyl at a business parking lot in Newport, Maine. Specifically, the CI entered the back seat of a Honda SUV bearing a Massachusetts plate, which was registered to Alexis De Leon. She described there being two males in the back seat of the SUV, which was driven by an unknown female. Jane Doe 5 described the males in the back seat area as the brothers she had previously purchased from, which I understood to be Ramon De Leon and Alexis De Leon. She stated she had entered the vehicle and provided the buy money to Ramon De Leon in exchange for the suspected fentanyl that she later turned over to agents.

11. Following the controlled purchase described above, agents conducted surveillance on the Honda SUV. Agents observed a silver Subaru meeting with the Honda SUV in Kenduskeag, after which the Subaru departed from the meeting and traveled towards Bangor, Maine. A Deputy with the Penobscot County Sheriff's Office

---

[3] There were a number of additional developments in this investigation that are not summarized herein as they do not directly relate to the Device at issue in this warrant application.

then initiated a traffic stop on the Subaru, and was joined by MDEA Agent Dan Gastia on the traffic stop. As the deputy approached the vehicle on the drivers' side, Agent Gastia approached on the passenger side and observed the driver and only occupant reaching under his seat. That male was removed from the vehicle and identified as Andrew Marin. MDEA Agent Dan Gastia then asked Marin where the drugs were located and Marin stated they were under his seat. The vehicle was searched roadside and officers found a large clear plastic bag containing a substance that appeared to be fentanyl powder.

12. I arrived and provided a Miranda warning to Marin. He agreed to speak with me. He stated he had obtained 50 grams of fentanyl that day from "Leon" and that he had obtained them for him and his fiancée to use. When asked if he ever sold drugs, he stated he has a friend that he sometimes sells to. He identified the Leon Leon account as associated with the individual he had made this and other purchases from, and stated he recently communicated with the individual using the 9606 number. Marin acknowledged that his own cellular phone (the Device) was in his vehicle and provided consent for agents to review his messages with the 9606 number. Based on my review and interpretation of these messages, and based on my training and experience, the messaging with the 9606 number showed Marin arranging for multiple purchases of fentanyl from the owner of the 9606 number, including on April 21, 2024.

13. Based on my training and experience, 50 grams of fentanyl is a significant quantity of fentanyl that would be very unusual for an individual to purchase solely for personal use (or even to share with just one other individual). Additionally, based on my training and experience and interpretation of the limited messaging reviewed on

Marin's phone, they also showed Marin was distributing fentanyl purchased via the 9606 number. For example, on April 5, 2024, Marin's phone thanked the 9606 number for giving him that new number and then, on April 8, 2024, texted the 9606 number: "Also, I need product that's rocky and strong or no one will buy it, I haven't been happy with the product for awhile and I've already complained many times, but it doesn't change . . . . I was worried and didn't want to upset you because we worked together well for so long, and you deserve to know, but I just can't afford to keep buying that product every week because no one wants it and I got stuck paying for it all myself many weeks in a row."

14.     During his interview, Marin stated he had been purchasing fentanyl from Leon for approximately one year. He identified a photograph of Ramon De Leon as "the brother" and a photo of Alexis De Leon as "Leon." He stated that on the day of this particular stop, he had received drugs directly from Ramon and had seen Alexis De Leon in the vehicle as well. He said he did not know the female driver but had seen her "7-8 weeks ago" when he purchased drugs from Leon in Bangor.

15.     During this incident, a phone number associated with the Device was identified, namely (207) 816-9099. Toll records received as to phone numbers associated with the Leon DTO show contact with this number and the Leon DTO before April of 2024, corroborating Marin's claim that he purchased fentanyl from Leon before April of 2024.

16.     Following this interview, I took custody of the Device.

*Status of Device to be Searched*

17.     The Device is currently in the lawful possession of DEA. It came into the agency's possession as a result of the seizure describe above. I seek this warrant to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws. The Device is currently in storage at an evidence locker at DEA Bangor Post of Duty Office in Hermon, Maine. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the DEA.

## TECHNICAL TERMS

18.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic

data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for

   entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

  f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

19. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. It is also capable of accessing the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

20. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

13

21. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge

       about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

22. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

23. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

24. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

*Nicholas Rich*
Nicholas Rich, Special Agent
U.S. Drug Enforcement Administration

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: May 01 2024

City and state: Bangor, ME

*Judge's signature*

John C. Nivison U.S. Magistrate Judge
*Printed name and title*